Opinión disidente emitida por la
Juez Asociada Señora Rodríguez Rodríguez, a la que se unen la Jueza Presidenta Señora Fiol Matta y la Jueza Asociada Oronoz Rodríguez.
“[C]on la iglesia hemos dado, Sancho"(1)
Disiento enérgicamente de la determinación que hoy emite una mayoría de este Tribunal por entender que pro-cede la entrega de la información requerida por el Departamento de Justicia, tal y como ordenó el Tribunal de Pri *330 mera Instancia. En cambio, hoy una mayoría de este Tribunal devuelve el caso al foro primario para que celebre una vista evidenciaría innecesaria, concediéndoles así a los peticionarios una segunda oportunidad para corregir las deficiencias de la prueba que presentaron. Todo esto a pesar que la opinión de conformidad concluye que los peticionarios tenían el peso de probar que cumplieron con los requisitos de la Regla 511 de Evidencia, 32 LPRAAp. VI, y que la prueba que obra en el expediente es insuficiente para llegar a tal conclusión.
Luego, la mayoría trastoca el balance consagrado en nuestra Constitución para otorgarle a los peticionarios poderes que exceden lo contemplado en nuestro ordenamiento, permitiéndoles invocar su derecho a la intimidad y libertad de culto para coartar la responsabilidad del Estado de investigar y encausar la comisión de delitos sexuales contra los más vulnerables: menores de edad presuntamente víctimas de delitos sexuales. Así, a través de fundamentos jurídicos contradictorios y ordenando un pro-ceder desacertado y oneroso —tanto para el Estado, como para las víctimas— la mayoría de este Tribunal evade su responsabilidad de lograr justicia y adjudicar las controversias ante su consideración. Tenemos entonces que plantearnos: ¿quiénes protegen a los menores?
Pasemos entonces a resumir los hechos que sirven de trasfondo a esta controversia.
I
A raíz de una investigación sobre la posible comisión de varios delitos sexuales por parte de sacerdotes adscritos a la Diócesis de Arecibo de la Iglesia Católica (Diócesis), el Departamento de Justicia, por conducto del Fiscal de Distrito de la Fiscalía de Arecibo, emitió varios subpoenas contra el Obispo de la Diócesis, Monseñor Daniel Fernández *331 Torres (Obispo), y su Vicario General, Rev. Luis Colón García (Vicario).
La información solicitada por medio de los subpoenas estaba relacionada a una investigación interna que realizó la Diócesis tras recibir varias querellas que denunciaban conducta sexual inapropiada por parte de sacerdotes bajo su supervisión. La investigación se realizó conforme al procedimiento uniforme establecido por la Conferencia Episcopal Puertorriqueña, organismo que reúne a todos los obispos de la Iglesia Católica en Puerto Rico, para atender alegaciones de conducta sexual impropia. En este caso, el Obispo encomendó la investigación a su Vicario, quien entrevistó y tomó declaraciones de las víctimas, querellantes y demás testigos en ausencia de terceros y garantizándoles que la Diócesis mantendría lo comunicado en confidencialidad. Además del Vicario, en la investigación también intervinieron el Obispo, notarios, consultores y profesionales que aportaron pericia, por lo que solamente algunos de los que intervinieron lo hicieron en capacidad de sacerdotes o clérigos de la Iglesia. La investigación produjo un expediente que recogió los documentos utilizados y preparados durante esta. Posteriormente, los hallazgos fueron referidos a la Congregación para la Doctrina de la Fe, organismo de la Iglesia Católica responsable de juzgar las infracciones graves cometidas contra la doctrina católica. La investigación culminó en la expulsión de seis sacerdotes de la Diócesis.
Los primeros dos subpoenas en controversia fueron emitidos el 30 de enero de 2014, uno dirigido al Obispo y otro al Vicario. Específicamente, ambos subpoenas solicitaban que comparecieran o suministraran los nombres, las direcciones y toda información relacionada a los querellantes, tanto menores como adultos, que han alegado ser víctimas de delitos sexuales cometidos por sacerdotes adscritos a la Diócesis durante los últimos diez años, y los querellados. Además, solicitaron información sobre cómo la Diócesis y las personas responsables de atender las querellas resolvieron éstas. *332 Para cumplir con los requerimientos, el 6 de febrero de 2014 la Diócesis presentó una certificación suscrita por su Canciller, la cual únicamente contenía los nombres de los sacerdotes contra quienes se presentaron las querellas.
Inconformes con la información suministrada, el Fiscal de Distrito emitió dos subpoenas adicionales contra el Obispo. El primero, emitido el 6 de febrero de 2014, le requirió suministrar la misma información solicitada mediante el primer subpoena en su contra. El segundo, emitido el 7 de febrero de 2014, lo citó a comparecer para entregar información sobre la investigación relacionada a los alegados delitos sexuales cometidos para el 2009 por un sacerdote en particular, el exsacerdote Edwin Mercado Viera. Ambos subpoenas citaron al Obispo para que compareciera a la Fiscalía de Arecibo el 12 de febrero de 2014 y entregara la información requerida.
El 12 de febrero, fecha cuando el Obispo debía comparecer ante la fiscalía, el Obispo y su Vicario presentaron una demanda ante el Tribunal de Primera Instancia. En esta solicitaron que el Tribunal dictara sentencia declaratoria para decretar la nulidad de los subpoenas emitidos en su contra. Además, solicitaron un injunction preliminar y permanente al amparo de la Regla 57 de Procedimiento Civil, 32 LPRA Ap. V) para que se ordenara la paralización de los procedimientos investigativos que realiza el Departamento de Justicia sobre los asuntos internos de la Diócesis de Arecibo que incidan directa o indirectamente sobre los dogmas, las creencias y doctrinas de su religión católica. Los peticionarios alegaron que al entregar la certificación suscrita por el Canciller de la Diócesis el 6 de febrero de 2014 cumplieron con los requerimientos del Departamento de Justicia. También alegaron que los subpoenas son nulos por violar la cláusula constitucional que instituye la separación entre iglesia y Estado, pues este garantiza la libertad de culto y prohíbe el establecimiento de religión alguna.
*333 Además, sostuvieron que los subpoenas sufren de amplitud excesiva y colocan a la Diócesis en riesgo de sufrir un daño irreparable, pues la información solicitada es confidencial y entregarla laceraría su libertad de culto, la cual incluye la potestad de manejar sus asuntos internos y disciplinarios. Finalmente, alegaron que entregar esa información violaría los derechos de intimidad y dignidad de las víctimas de abuso sexual que voluntariamente acudieron a la Iglesia de acuerdo con las garantías de intimidad y privacidad provistas en el procedimiento canónico. Todo esto, pues sostienen que la mayoría de los veinte casos de abuso sexual ya han prescrito y algunos no constituyen conducta delictiva, sino meros actos consensúales entre mayores de edad que no están tipificados como delitos.
El 19 de febrero de 2014, una de las alegadas víctimas que denunció conducta impropia ante la Diócesis, el interventor DJMG, presentó una moción para intervenir en el pleito y una demanda de intervención. Indicó que actual mente tiene veintitrés años de edad, que entre las edades de doce y quince años fue abusado sexualmente por un sacerdote de la Diócesis y que hace tres años presentó una querella ante la Iglesia por los hechos ocurridos. Alegó que si los peticionarios divulgan la información solicitada por el Departamento de Justicia se verían afectados sus derechos constitucionales a la protección de su intimidad y dignidad, y el libre ejercicio de su religión católica. Amparándose en la Regla 511 de Evidencia (32 LPRA Ap. IV) y la Carta de Derechos de las Víctimas y Testigos de Delito, Ley Núm. 22 de 22 de abril de 1988 (25 LPRA see. 973 et seq.), sostuvo que si la Diócesis cumplía con el requerimiento violaría el privilegio evidenciario que le permite impedir que el sacerdote que realizó la investigación divulgue lo que le comunicó. Esto, pues presentó la querella y participó en la investigación de *334 la Diócesis con la expectativa de que la Iglesia protegería la confidencialidad de la investigación.(2)
En cuanto a la Carta de Derechos de las Víctimas y Testigos, el interventor sostiene que ésta garantiza la confidencialidad de la información en posesión de la Diócesis que lo pueda identificar y prohíbe que se divulguen las comunicaciones confidenciales que realizó. Expone que utilizó el mecanismo confidencial que le proveyó la Diócesis, pues según sus creencias religiosas entiende que es un asunto a dilucidarse internamente, en la Iglesia Católica, y no le interesa que el asunto sea investigado por el Estado. Por ser mayor de edad, razonó que tiene derecho a defender su intimidad y evitar que sus problemas personales se diluciden públicamente en un juicio criminal.
El 20 de febrero de 2014, el Estado compareció al pleito y solicitó la desestimación de la demanda por esta no exponer una reclamación que justifique la concesión de un remedio y no cumplir con los requisitos para conceder un injunction preliminar o permanente. Adicionalmente, alegó que el Secretario de Justicia tiene la facultad en ley para investigar y procesar todos los casos de naturaleza penal bajo la jurisdicción del Estado Libre Asociado, por lo que la negativa de los peticionarios de entregar la información requerida constituye una limitación indebida al poder investigativo del Estado. Ante el planteamiento de la naturaleza confidencial de la investigación realizada por la Diócesis, el Estado argumentó que el Departamento de Justicia cuenta con mecanismos adecuados para salvaguardar la confidencialidad de los documentos y proteger la seguridad y privacidad de las víctimas. Adujo que el interés que persigue el Estado con los requerimientos es de la más alta jerarquía —investigar y procesar el abuso sexual contra menores, al igual que otros posibles delitos sexuales— por lo que la investigación de hechos constitutivos de delitos no puede considerarse un *335 asunto interno sobre el cual la Iglesia ostente la responsabilidad exclusiva de investigar y sancionar. Finalmente, sostuvo que este tipo de investigación no es el tipo de acción estatal que proscribe la protección constitucional de la libertad de culto y la separación entre iglesia y estado, pues los subpoenas se emitieron en virtud de legislación neutral y de aplicación general, por lo que cualquier efecto posible sobre la práctica religiosa es meramente incidental y el Estado no está investigando las creencias y prácticas internas de la Diócesis.
Luego de varios trámites procesales, el Tribunal de Primera Instancia, mediante sentencia de 7 de abril de 2014, denegó la moción desestimatoria que presentó el Estado y dictó sentencia declaratoria avalando la constitucionalidad de todos los subpoenas impugnados. Concluyó que al emitir los subpoenas el Departamento de Justicia solicitó información específica relacionada a víctimas de delitos sexuales y los sacerdotes responsables de los alegados delitos, por lo cual los requerimientos inciden directamente sobre la investigación criminal que realiza. Asimismo, sostuvo que los subpoenas, al haberse emitido al amparo de una ley neutral de aplicación general y estar limitados a una in vestigación criminal corriente, no afectan el libre ejercicio de la religión católica o interfieren indebida o sustancialmente en los procesos internos de la Iglesia. Además, no concedió los injunctions solicitados, pues los peticionarios no demostraron que sufrirían un daño irreparable. Finalmente, determinó que la información solicitada en los subpoenas no estaba protegida por el privilegio de la Regla 511 de Evidencia, supra, pues los practicantes de la religión católica solo pueden invocarlo sobre comunicaciones realizadas durante el sacramento de la confesión. Por lo tanto, ordenó a la parte demandante a entregar los documentos solicitados en un término de quince días.
En desacuerdo, el 16 de abril de 2014 los demandantes y la parte interventora presentaron ante el Tribunal de Pri *336 mera Instancia una “Moción para que se formulen determinaciones de hechos y conclusiones de derecho adicionales y en solicitud de reconsideración”, reiterando sus planteamientos constitucionales y solicitando unas determinaciones de hecho adicionales. La misma fue denegada el 22 de abril de 2014.
El 25 de abril de 2014, fecha cuando vencía el término concedido por el Tribunal de Primera Instancia para cumplir con los requerimientos de información y entrega de documentos, los demandantes presentaron un recurso de apelación ante el Tribunal de Apelaciones. También presentaron una solicitud en auxilio de jurisdicción ante el foro apelativo intermedio, rogándole que paralizara los efectos de la sentencia del foro primario hasta que resolviera el recurso en los méritos. No obstante, mientras el Tribunal de Apelaciones tenía ante su consideración ambos recursos, el 2 de mayo de 2014, los demandantes presentaron un recurso de certificación intrajurisdiccional ante el Tribunal Supremo.(3) Acompañaron su escrito con una moción en auxilio de jurisdicción para que ordenáramos la paralización de los efectos de la sentencia.
Mediante resolución emitida el 7 de mayo de 2013, acogimos el recurso de certificación y ordenamos la paralización de los efectos de la sentencia. Le concedimos a las partes un término simultáneo de quince días para presentar sus alegatos y un segundo término simultáneo de cinco días a partir de la entrega de los alegatos para presentar sus alegatos en réplica.
En sus respectivos escritos, los peticionarios —la Diócesis de Arecibo, su Obispo y Vicario, y el interventor DJMG— alegan la comisión de los errores siguientes por parte del Tribunal de Primera Instancia. En primer lugar, sostienen que erró el Tribunal al resolver que las comunicaciones confidenciales realizadas durante la investigación entre los denunciantes, víctimas y testigos, y el Vicario no *337 son comunicaciones privilegiadas al amparo de la Regla 511 de Evidencia a pesar de que cumplen con todos los requisitos del privilegio. Sostienen que erró el Tribunal al limitar la aplicación del privilegio exclusivamente al sacramento de la confesión católica, en clara violación a la protección constitucional de la libertad de culto y contra el establecimiento de religión. Además, sostienen que erró el foro primario al adjudicar la controversia ante su consideración sin antes examinar en cámara la información y los documentos sobre los que reclaman la protección constitucional y el privilegio estatutario.
En segundo lugar, argumentan que al validar la constitucionalidad de los subpoenas el Tribunal de Primera Instancia ignoró los reclamos de intimidad que levantaron los demandantes en nombre propio y en representación de las víctimas y la Diócesis. Finalmente, alegan que el foro de instancia erró al resolver que la confidencialidad de las comunicaciones entre el interventor DJMG y los demás denunciantes no forma parte de sus derechos como católicos, por lo que entienden que exigirle la entrega de la información requerida viola la libertad de culto protegida constitucionalmente.
Por su parte, el Estado argumenta que acoger la tesis de que los derechos constitucionales de los demandantes los eximen de cumplir con los subpoenas abriría la puerta a que cualquier persona se escude en las reglas internas de su religión para neutralizar el poder investigativo del Estado e impedir que desempeñe su responsabilidad de hacer cumplir las leyes e iniciar la acción penal en nombre del Pueblo. También sostiene que la información y documentación requerida en los subpoenas no está cobijada por el privilegio religioso-creyente de la Regla 511 de Evidencia, supra, pues lo comunicado durante la investigación fue divulgado a terceros.
Planteada así la controversia, procedemos a analizar el derecho aplicable.
*338 II
Antes de considerar los planteamientos constitucionales que levantan los peticionarios, debemos evaluar la aplicabilidad del privilegio religioso-creyente a la controversia ante nosotros.
A
El propósito principal de nuestras Reglas de Evidencia es el descubrimiento de la verdad en todos los procedimientos judiciales. 32 LPRA Ap. VI, R. 102. No obstante, en virtud de consideraciones de política pública, nuestro ordenamiento admite unas reglas de exclusión de evidencia, como lo son los privilegios, para adelantar ciertos intereses sociales que pueden resultar ajenos o hasta contrarios a la búsqueda de la verdad. E.L. Chiesa, Tratado de derecho probatorio, San Juan, Pubs. JTS, 2005, T. I, Cap. IV, See. 4.1 A y B, pág. 186. Precisamente por ser ajenos a la búsqueda de la verdad, al evaluar la existencia de un privilegio estos deben interpretarse de forma restrictiva, salvo que ostenten rango constitucional. 32 LPRAAp. VI, R. 518; Chiesa, op. cit., pág. 201. Véanse: Pagán et al. v. First Hospital, 189 DPR 509 (2013); Noriega v. Gobernador, 130 DPR 919, 940 (1992); Pueblo en interés menor L.R.R., 125 DPR 81, 88 (1985); Rodríguez v. Scotiabank de PR, 113 DPR 210, 214 (1982); Lugo Ortiz v. Ferrer, 85 DPR 862, 871 (1962).
Nuestras Reglas de Evidencia proveen un trato privilegiado a cierto tipo de comunicación habida entre un creyente y un religioso, permitiendo que ambos rehúsen revelar o impidan que se divulgue una comunicación confidencial habida entre ellos. A esos fines, nuestra Regla 511 de Evidencia reza como sigue:

Regla 511. Relación religiosa o religioso y creyente

(a) Según usadas en esta regla, las siguientes expresiones *339 tendrán el significado que a continuación se indica:
(1) Religiosa o religioso—Sacerdote, pastora, pastor, ministra, ministro, rabino, practicante de una religión, funcionaría o funcionario similar de una iglesia, secta o denominación religiosa o de cualquier organización religiosa.
(2) Creyente—Persona que le hace una comunicación penitencial o confidencial a una religiosa o un religioso.
(3) Comunicación penitencial o confidencial—Aquélla hecha por una persona creyente, en confidencia, sin la presencia de una tercera persona, a una que es religiosa y quien, en el curso de la disciplina o la práctica de su iglesia, secta, denominación u organización religiosa, está autorizada o acostumbrada a oír tales comunicaciones y que bajo tal disciplina tiene el deber de mantenerlas en secreto.
(b) Una religiosa o religioso, o una persona creyente, sea o no parte en el pleito, tiene el privilegio de rehusar revelar una comunicación penitencial o confidencial o impedir que otra persona la divulgue.
Según se desprende del inciso (b) de la Regla 511, supra, los poseedores del privilegio son los dos sujetos que participan en la comunicación confidencial, el creyente y el religioso, y ambos cuentan con legitimación para invocarlo y evitar la divulgación de la comunicación protegida. En cuanto a quién se considera un religioso para propósito del privilegio, el inciso (a)(1) indica que debe ser un funcionario afiliado a una secta religiosa organizada y reconocida, por lo que no incluye a los ministros autodenominados. Informe de las Reglas de Derecho Probatorio, pág. 281, citando a Notas del Comité Asesor Federal a la Regla 506 propuesta. Por otro lado, el inciso (a)(2) indica que creyente se refiere al sujeto que realiza la comunicación confidencial al religioso.
Aunque los poseedores del privilegio son fácilmente identificables, resulta complejo delimitar el alcance de las comunicaciones protegidas, pues no toda comunicación que ocurre entre un religioso y un creyente está cobijada por el privilegio. Informe de las Reglas de Derecho Probatorio, pág. 281; Chiesa, op. cit, pág. 281. Para que se cumplan los requisitos del privilegio, estos dos sujetos deben tener, al momento en que se realiza la comunicación, una relación par *340 ticular que surge según el tipo de comunicación que se tramite y las expectativas de cada uno al respecto.
El religioso tiene que acostumbrar o estar autorizado a recibir este tipo de comunicación, según sea la costumbre y práctica religiosa. Aunque la Regla 28 de 1979 limitaba el privilegio a la comunicación penitencial, evidentemente influenciado por el sacramento católico de la confesión, la Regla 511 deja a un lado esta limitación para salvaguardar el derecho a la libertad de culto y la protección contra el establecimiento de religión.(4) Del texto de la Regla 511 se desprende que no se requiere que la comunicación se realice en el ámbito de penitencia o confesión, o en busca de absolución espiritual, pues esa práctica religiosa podría ser ajena a un sinnúmero de religiones y sectas. Informe de las Reglas de Derecho Probatorio, pág. 281. En vez, el privilegio protege la comunicación confidencial realizada entre el creyente y el religioso para recibir algún tipo de consejería espiritual.
Ahora bien, nuestra Regla 511 contiene lenguaje muy particular en cuanto al requisito de confidencialidad que exige. Al definir la comunicación confidencial, la regla requiere que la comunicación se realice sin la presencia de terceros y con la creencia de que el religioso la mantendrá en secreto-, es decir, no la divulgará a ningún tercero, bajo ninguna circunstancia y sin distinción de quién es ese tercero.
Contrario a otros de nuestros privilegios evidenciarios, el texto de la Regla 511 no reconoce la posibilidad de que la *341 comunicación protegida se divulgue a terceros, aún si es con la intención de adelantar el propósito por el cual se realiza la comunicación. Véase, e.g., privilegio abogadocliente, Regla 503(a)(4); privilegio médico-paciente, Regla 506(a)(3); privilegio consejera-víctima del delito, Regla 507(a)(3), 32 LPRAAp. VI. El requisito de que la comunicación se guarde en secreto concuerda con el texto del privilegio, según establecido en las Sees. 1030 a 1034 del Código de Evidencia de California, el cual sirvió de base para la redacción de la Regla 511 de Evidencia, y era parte del texto de la antigua Regla 28.(5) Informe de las Reglas de Derecho Probatorio, pág. 280; Informe del Proyecto de Reglas de Evidencia de Junio de 1992.
Al momento de redactar su propuesta para las actuales reglas de evidencia, el Comité Asesor Permanente evaluó otras alternativas para el texto del privilegio religiosocreyente que preservarían la aplicación del privilegio aún luego de cierta divulgación a terceros. Por ejemplo, el privilegio religioso-creyente, según plasmado en las Reglas de Evidencia Federales propuestas permite que la comunicación privilegiada sea divulgada a terceros, siempre y cuando sea para adelantar el mismo fin por el cual se realiza la comunicación. En lo pertinente, la Regla 505 dis-pone que para propósitos de este privilegio
[a] communication is "confidential” if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication. 1 Joseph *342 et al., Evidence in America: the Federal rules in the states, Sec. 27.1 (1994).
Así, la regla modelo federal extiende el privilegio a otras comunicaciones confidenciales entre el religioso y creyente, y no meramente a aquella que el religioso esté obligado a mantener en secreto. Id., See. 27.3.
De hecho, varios comités que evaluaron las Reglas de Evidencia de 1979 habían propuesto redactar el privilegio de forma tal que se pudiera invocar aún luego de cierta divulgación a terceros, tal y como dispone la regla federal propuesta.(6) Al evaluar la regla propuesta por el Comité Permanente en 1992, el profesor Rolando Emmanuelli Jiménez indicó que:
La Regla propuesta adiciona al inciso (A)(3) que la comunicación puede divulgarse a terceras personas cuando sea necesario para llevar a cabo los propósitos de la comunicación. Esta adición desvirtúa la naturaleza y razón de ser del privilegio, pues éste debe estar circunscrito a proteger la estrecha e íntima relación sacerdote-feligrés en el plano espiritual. Permitir la divulgación a terceras personas sin que se entienda renunciado el privilegio parece un contrasentido. R. Emmanuelli Jiménez, Prontuario de derecho probatorio puertorriqueño, San Juan, Ed. Situm, 2012, pág. 369.
No obstante, al redactar el texto de la actual Regla 511, el Comité Asesor Permanente rechazó alterar el lenguaje *343 de la antigua Regla 28 que requería mantener lo comunicado en secreto. Informe de las Reglas de Derecho Probatorio, pág. 280. Este rechazo reafirma que la intención de la actual Regla 511 es limitar el ámbito del privilegio a las comunicaciones que el religioso está obligado a mantener en secreto, más allá de la mera confidencialidad.
Por todo lo anterior, para invocar el privilegio religiosocreyente de la Regla 511, la comunicación debe (1) realizarse en confidencia y en ausencia de terceros, (2) a un religioso que, según la práctica de su organización religiosa, acostumbre o esté autorizado a recibir este tipo de comunicación y (3) el religioso tiene que estar obligado según la práctica o creencia de la religión a mantener la comunicación en secreto.
Como se indicó, la Regla 511 es sustancialmente idéntica a las Sees. 1030-1034 del Código de Evidencia de California. Con lo cual, lo resuelto por el Tribunal de Apelaciones de California en Roman Catholic Archbishop of Los Angeles v. Superior Court, 131 Cal. App.4th 417 (2005), es particularmente relevante para la controversia que hoy tenemos ante nuestra consideración. En aquella ocasión, un gran Jurado que investigaba alegaciones de abuso sexual hacia menores por parte de dos sacerdotes católicos emitió varios subpoenas contra la Arquidiócesis para requerir la entrega de varios documentos relacionados a los crímenes que investigaba. Aunque inicialmente entregaron los documentos, varios sacerdotes y la Arquidiócesis misma acudieron al Tribunal Superior de California y solicitaron que anulara los subpoenas. Para atender los reclamos de los demandantes, el Tribunal Superior nombró un árbitro para evaluar la evidencia presentada y los reclamos de las partes, y determinar qué documentos debían entregarse al gran jurado. Al resolver, el árbitro denegó la solicitud de los demandantes de anular los subpoenas y ordenó la entrega de los documentos solicitados, salvo algunos protegidos por otros privilegios evidenciarios. El árbitro concluyó *344 que el privilegio no aplicaba porque la comunicación entre el religioso y creyente había sido divulgada a un tercero, entendiendo que la arquidiócesis había realizado una investigación similar a la que llevaría a cabo cualquier patrono ante alegaciones contra un empleado abuso sexual contra menores.
Los demandantes acudieron en revisión al Tribunal de Apelaciones, solicitando que el Tribunal impidiera la entrega de quince documentos en específico. En resumidas cuentas, sostuvieron que su religión católica obligaba a los obispos católicos a velar por el bienestar emocional, físico y espiritual de los sacerdotes bajo su supervisión por lo que divulgar las comunicaciones habidas entre el clero de la arquidiócesis y su obispo violaba la libertad de culto de los demandantes y están amparadas por el privilegio creyentereligioso.
Según demostraron los demandantes en Roman Catholic Archbishop of Los Angeles v. Superior Court, supra, el Arzobispo de Los Ángeles había realizado una investigación sobre alegaciones de conducta sexual inapropiada por parte de algunos sacerdotes bajo su supervisión. Durante la investigación, sostuvo conversaciones privadas con algunos de los sacerdotes, sobre las cuales ambos —el sacerdote y el arzobispo— tenían expectativa de que los resultados se mantendrían confidenciales y separados de sus expedientes personales. No obstante, los resultados de la investigación se comunicaron al Cardenal, varios vicarios y otros empleados de la arquidiócesis, tal y como esperaban los que participaron en la investigación. Al evaluar si las comunicaciones entre los sacerdotes y el arzobispo estaban protegidas por el privilegio californiano, el Tribunal de Apelaciones hizo hincapié en el requisito de la sección 1032 de que la comunicación se realizara en ausencia de terceros y que el religioso tuviera la obligación de mantenerla en secreto. Roman Catholic Archbishop of Los Angeles, supra, págs. 226-227. El Tribunal concluyó que al momento de realizar la comuni *345 catión, los sacerdotes entendían que el religioso, en este caso el arzobispo, mantendría la confidencialidad de lo comunicado solamente en la jerarquía de la Iglesia, mas no en secreto absoluto, pues el expediente demostraba que los sacerdotes que participaron en la investigación realizada por la Iglesia eran conscientes de que lo comunicado se compartiría con más de una persona. El hecho de que tanto el religioso como el creyente conocían que la comunicación se divulgaría a terceros impidió, desde el momento mismo de la enunciación, cualquier reclamo bajo el privilegio religiosocreyente de la See. 1032 del Código de Evidencia de California. Id., pág. 445.
B
En este pleito, los peticionarios razonan que al participar en la investigación estaban ejerciendo sus creencias religiosas, pues como creyentes deseaban atender sus reclamos junto a la consejería espiritual que les ofrece el procedimiento interno de sanciones de la Diócesis. Por lo tanto, alegan que las comunicaciones habidas entre las víctimas y los vicarios, las cuales sirvieron de base para los expedientes investigativos que creó la Diócesis, son comunicaciones privilegiadas entre un creyente y un religioso protegidas de divulgación alguna al amparo de la Regla 511 de Evidencia. No les asiste la razón.
Para invocar exitosamente el privilegio que concede la citada Regla 511, la parte que reclama su aplicación tiene el peso de demostrar que ha cumplido con todos sus requisitos. De igual forma, reiteramos que las Reglas de Evidencia nos imponen la obligación de interpretar restrictivamente los privilegios evidenciarios estatutarios, como lo es el privilegio creyente-religioso. 32 LPRA Ap. VI, R. 518. En la controversia ante nuestra consideración, no dudamos que los peticionarios han demostrado que la comunicación sobre la cual reclaman el privilegio ocurrió entre *346 un creyente y un religioso, y este último estaba autorizado a recibir ese tipo de comunicación según la doctrina católica y la encomienda del Obispo. Sin embargo, todos los peticionarios —el Obispo, el Vicario y la parte interventora— han reconocido expresamente que, aunque las víctimas confiaban que la Diócesis mantendría la confidencialidad de lo comunicado durante la investigación ante personas extrañas a su organización, al momento de participar en la investigación eran conscientes de que lo expresado al Vicario sería a su vez comunicado a otras personas y no se mantendría en secreto.
El foro primario determinó que las quejas fueron referidas a la Congregación para la Doctrina de la Fe y que en la investigación intervino más de una persona, entre ellos sacerdotes, notarios y otros profesionales, determinación de hecho que ninguna parte intentó o ha intentado impugnar. Apéndice, págs. 62-63. Si bien confiaban en que todos los que participarían en la investigación serían funcionarios de la Iglesia Católica, el privilegio exige que el religioso mantenga la comunicación en secreto y no contempla posibilidad alguna de que sea divulgada a un tercero, independientemente de su estatus como religioso. El que este tercero ostente o no estatus de religioso en la organización religiosa es inmaterial para propósitos de la Regla 511 de Evidencia, supra.
Desde que decidieron participar en la investigación las víctimas y el Vicario entendían plenamente que lo comunicado entre ellos no se mantendría en secreto. Para poder invocar el privilegio religioso-creyente, los creyentes debieron enunciar su declaración no solo en ausencia de terceros, si no con la intención de que lo comunicado sería mantenido en secreto. Es decir, que lo comunicado no sería divulgado a ninguna persona, sea esta o no parte de la jerarquía de la Iglesia. A su vez, el religioso que recibe la comunicación debe estar obligado, según la práctica y doctrina de su religión, a mantener esa comunicación en se *347 creto, aun frente a otros religiosos. El privilegio tampoco permite que se divulgue lo comunicado para adelantar el propósito mismo por el cual se recibió, aun si es para brindar mejor consejería espiritual. Si bien las partes tenían la expectativa de que la Iglesia protegería la confidencialidad de lo comunicado, la intención de las partes no cumple con la expectativa de que lo comunicado permanecería en secreto. Los documentos producidos por la investigación interna de la Diócesis no son comunicaciones privilegiadas al amparo del privilegio religioso-creyente de la Regla 511 de Evidencia, supra. Por ende, no erró el Tribunal de Primera Instancia al declinar aplicar el privilegio.
No obstante, reconocemos que sí erró el Tribunal de Primera Instancia al limitar el alcance del privilegio religiosoinvocado por un católico a lo comunicado durante el sacramento de la confesión. A pesar de que el privilegio se concibió originalmente para proteger la comunicación habida en esa práctica católica, el texto moderno de la Regla 511, junto a las protecciones constitucionales de libertad de culto y contra el establecimiento de la religión, extiende el privilegio a toda comunicación que cumpla con los tres requisitos que hemos esbozado. Por lo tanto, bien podría un religioso o creyente católico invocar el privilegio en situaciones adicionales al sacramento de la confesión, siempre y cuando concurran los tres requisitos esbozados.
Finalmente, debido a que los resultados de la investigación no están cobijados por el privilegio religioso-creyente, tampoco erró el Tribunal de Primera Instancia al no celebrar un examen en cámara para determinar qué documentos están cobijados por el privilegio. Los demandantes meramente alegaron de forma general que toda la información requerida mediante los subpoenas está cobijada por el privilegio. No intentaron identificar específicamente qué documentos están protegidos, ni por qué, por lo que el Tribunal de Primera Instancia no se encontraba en posición de realizar ese examen.
*348 C
Tras concluir correctamente que la Regla 511 de Evidencia exige que la comunicación privilegiada sea mantenida en secreto, una mayoría de este Tribunal devuelve el caso ante el foro de instancia para que celebre un examen en cámara donde evalúe si de hecho el Vicario mantuvo su investigación en secreto. Este examen resulta innecesario y dilatorio pues es evidente que en este caso las comunicaciones no se mantuvieron en secreto y las partes ni han intentado demostrarlo. La confidencialidad que la Diócesis les prometió a las víctimas implicaba que el Vicario comunicaría el resultado de su investigación al Obispo y otros actores, incluyendo el Vaticano, según les exige el procedimiento establecido en la Conferencia Episcopal de Puertorriqueña. Tal y como concluyó el Tribunal de Primera Instancia y relata la Opinión de conformidad:
[La investigación] produjo varios expedientes que recogieron los documentos preparados durante la investigación. Junto al Vicario General, participaron de la investigación el Obispo, notarios, consultores y profesionales que aportaron pericia, por lo que solamente algunos de los que intervinieron eran sacerdotes o clérigos de la Iglesia Católica. Opinión de conformidad, pág. 297.
Los demandantes no pormenorizaron qué documentos están cobijados por el privilegio de forma tal que el Tribunal se encuentre en posición de evaluar cuáles están protegidos o no por el privilegio, o los derechos constitucionales invocados. Más allá de que se desprende que la condición de confidencialidad que prometió, la Diócesis no cumple con el requisito de mantener en secreto que exige la Regla 511 de Evidencia los demandantes tenían el peso de probar que la comunicación fue mantenida en secreto. La propia opinión de conformidad reconoce que los demandantes no lograron probar ello ante el foro de instancia:
Ahora bien, el expediente de este caso no nos permite concluir *349 si las declaraciones en controversia se mantuvieron en secreto, según requiere la Regla 511 de Evidencia.
Claramente, la Regla 511(a)(3) de Evidencia, id., requiere que el religioso no divulgue la comunicación a nadie. En este caso no se presentó prueba, más allá de lo ya señalado, de cómo la Iglesia Católica tramitó los expedientes en controversia. Así las cosas, no podemos resolver si los documentos producidos en esas investigaciones son comunicaciones privilegiadas al amparo del privilegio religioso-creyente de la Regla 511 de Evidencia, supra. Opinión de conformidad, pág. 306.
Ante todo lo anterior y considerando que la Regla 518 de Evidencia exige que los privilegios se interpreten restrictivamente, ¿qué exactamente deberá adjudicar el Tribunal de Primera Instancia en cuanto la aplicación del privilegio religioso-creyente? Al devolver el caso al foro de instancia para que celebre un examen en cámara la mayoría concede a los demandantes una segunda oportunidad para corregir los defectos de sus argumentos y suplementar la insuficiencia de la prueba que desfilaron ante el foro primario. ¿Por qué el trato preferencial? ¿Qué prueba nueva se podrá presentar? Este procedimiento incierto, ¿no afectará los términos prescriptivos de los potenciales delitos que se investigan?
III
Dado a que el reclamo de materia privilegiada al amparo de la Regla 511 no aplica a los hechos de esta controversia, pasemos entonces a evaluar el reclamo de los peticionarios de que los subpoenas emitidos infringen su derecho a la intimidad. Los peticionarios sostienen que la autonomía sobre decisiones personales que protege el derecho a la intimidad cobija, necesariamente, la decisión de las víctimas sobre cómo encausar el agravio que alegadamente sufrieron en manos de los sacerdotes investigados por la Diócesis. De igual forma, señalan que la investigación que realiza el Estado es una intromisión indebida so *350 bre aspectos de su vida sexual. Por su parte, la Diócesis razona que posee una expectativa de intimidad sobre los documentos que produjo su investigación interna, por lo que están protegidos por la cláusula constitucional contra los registros y allanamientos irrazonables.
A
En nuestro ordenamiento, el derecho a la intimidad y dignidad está protegido por las Secs. 1, 8 y 10 del Art. II de la Constitución del Estado Libre Asociado, LPRA, Tomo 1. E.L.A. v. P.R. Tel. Co., 114 DPR 394, 401 (1983). Igual protección brinda la Constitución de Estados Unidos en su Decimocuarta Enmienda. Este derecho tiene como propósito proteger a la persona de ataques abusivos a su honra, reputación y vida privada. Art. II, Sec. 8, Const. PR. Igualmente, protege la autonomía del individuo al tomar decisiones sobre asuntos de máxima importancia, incluyendo sus pensamientos y el control de la información sobre su persona que posee el Estado como producto de investigaciones policiales o judiciales. Véanse: Arce v. Martínez, 146 DPR 215 (1998); Arroyo v. Rattan Specialties, Inc., 117 DPR 35 (1986); Pueblo v. Torres Albertorio, 115 DPR 128 (1984). Véase, además, J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis., 2009, pág. 695. Asimismo, nuestra Constitución protege la intimidad de la persona y sus pertenencias contra registros, incautaciones y allanamientos irrazonables por parte del Estado. Art. II, Sec. 10; Pueblo v. Loubriel, Suazo, 158 DPR 371, 378-379 (2003).
Empero, esta protección no opera automáticamente. Quien la invoque tiene que demostrar que “tiene un derecho razonable a abrigar, donde sea, dentro de las circunstancias del caso específico, la expectativa de que su intimidad se respete”. E.L.A. v. P.R. Tel. Co., supra, pág. 402. *351 Hemos considerado que existe una expectativa razonable de intimidad cuando concurren dos elementos: “(1) el subjetivo, mediante el cual el reclamante, según las circunstancias del caso, alberga una expectativa real de que su intimidad se respete, y (2) el criterio objetivo, es decir, si la sociedad considera razonable tener tal expectativa”. López Tristani v. Maldonado, 168 DPR 838, 852 (2006). En esta ocasión, el segundo elemento es el decisivo. Weber Carrillo v. ELA et al., 190 DPR 688 (2014).
B
Los demandantes, así como el interventor DJMG, alegan que entregar los documentos requeridos tendría el efecto de violar el derecho a la intimidad de las víctimas, pues esto los revictimizaría. Argumentan que, en el caso de las víctimas mayores de edad, “la decisión de cómo encausar un agravio contra su persona, queda referido [al] juicio discrecional de cada una de las víctimas, sostenido en la autonomía del individuo y su derecho a la intimidad y privacidad”. Alegato de la parte peticionaria en petición de certificación, pág. 31.
No podemos validar la contención de los peticionarios. La autonomía personal protegida por el derecho a la intimidad no incluye la decisión de procesar o no a un individuo que haya cometido un delito en su contra. Más aún cuando consideramos el interés apremiante del Estado de combatir la criminalidad y procesar toda conducta delictiva. Veamos.
En nuestro ordenamiento jurídico el delito se considera una ofensa de carácter público, pues su consecuencia final recae sobre los derechos del cuerpo político y la sociedad en general. Pueblo v. Castellón, 151 DPR 15, 25-26 (2000). Es por esto que el Estado tiene un interés apremiante en procesar a los delincuentes por los delitos que han cometido y “[l]a aplicación de las leyes penales no se deja a la potestad *352 de particulares”. íd., pág. 25. Es responsabilidad exclusiva del Estado determinar si acusa o encausa al delincuente, independientemente de que la víctima del delito perdone a su victimario o esté renuente a participar, por las razones que fueran, en el proceso penal. Id.
Asimismo hemos reiterado que “[l]a facultad y responsabilidad de investigar los hechos delictivos y la decisión de a qué persona acusar y procesar criminalmente y por qué delito, recae en la persona del Secretario de Departamento de Justicia de Puerto Rico y de los fiscales bajo su supervisión”. Pueblo v. Dávila Delgado, 143 DPR 157, 170 (1997). Aunque reconocemos el papel importante que tienen las víctimas y los testigos en el procesamiento de un caso criminal, estos no se consideran partes para fines del proceso criminal, por lo cual carecen de los derechos que de ordinario tienen las partes en un procedimiento judicial. Pueblo v. Castellón, supra, pág. 25; Pueblo v. Acosta Pérez, 190 DPR 823 (2014). En síntesis:
La víctima [...] de un delito no tiene el poder de vetar la actuación o el curso de acción que el Fiscal entienda procedente seguir en el caso. Esto es así porque los delitos en general son ofensas cometidas contra la sociedad y no contra un individuo en particular. Aunque con la comisión de delitos se lesionan intereses particulares privados, también se afectan fundamentales postulados sociales y comunitarios. Pueblo v. Castellón, supra, pág. 25.
Según lo anterior y conforme al interés apremiante del Estado de investigar y procesar toda conducta delictiva, resulta evidente que la víctima no tiene la potestad de decidir si se debe procesar criminalmente al delincuente que le causó el agravio. La autonomía personal que protege el derecho a la intimidad no cobija esa decisión. Por ende, en este caso los subpoenas son un ejercicio válido del poder de investigación del Estado. Resolver lo contrario sería proveerles a las víctimas de delitos el poder de vetar el encausamiento criminal e inmiscuirse indebidamente en el poder *353 del Departamento de Justicia de investigar y procesar a los criminales en nombre del cuerpo político.
Los peticionarios también alegan que no procede la entrega de los documentos porque la divulgación de la información al Estado afectaría el derecho a la intimidad de las víctimas sobre aspectos de su vida sexual. No hay duda de que toda persona tiene un derecho a la intimidad sobre su vida sexual e íntima. No obstante, entendemos que en este caso las alegadas víctimas no pueden abrigar una expectativa objetiva de intimidad sobre los hechos constitutivos del delito frente al poder investigativo del Estado.
Nuestra Constitución delega al Estado, y particularmente al Departamento de Justicia, la responsabilidad de velar por el cumplimiento de la ley e investigar y procesar los delitos, además del deber de proteger a los menores de edad de delitos de agresión sexual. No cabe hablar de reconocer una expectativa de intimidad sobre hechos relacionados a la comisión de un crimen cuando a la misma vez la sociedad tiene una expectativa de que el Estado investigue y procese a los individuos por esos mismos hechos delictivos. La víctima es un testigo del delito cometido en su contra, por lo cual ante una investigación del Estado no puede argumentar protecciones adicionales a las que podría alegar cualquier otro testigo. 34 LPRA see. 1476.
No obstante, aunque no podemos avalar que los hechos constitutivos de un delito estén protegidos por el derecho a la intimidad de las víctimas, estas no quedan despojadas de la protección de otros derechos constitucionales. Esta determinación tampoco incide sobre la responsabilidad del Estado al manejar la información personal que obtenga a raíz de su investigación. La privacidad de las víctimas no queda desprotegida ante el proceso investigativo o judicial que realizará el Departamento de Justicia. A manera de ilustración, en cuanto a la confidencialidad de la investigación realizada por el Departamento de Justicia, la Ley del Departamento de Justicia, Ley Núm. 205 de 9 de agosto de *354 2004 (3 LPRA secs. 291-296(h) (Ley Núm. 205), dispone lo siguiente:
La información obtenida como resultado de la investigación realizada es confidencial y debe mantenerse en un expediente investigativo, el cual no puede ser objeto de inspección, examen, ni divulgación mientras se conduce la investigación. La información así recopilada puede ser divulgada una vez concluida la investigación conforme las normas que adopte el Secretario mediante reglamento, excepto en aquellos casos en que surjan las siguientes situaciones:
(a) Una ley o reglamento declare la confidencialidad de la información.
(b) Se revele información que pueda lesionar derechos fundamentales de terceros.
(c) La comunicación esté protegida por alguno de los privilegios evidenciarios que pueden invocar los ciudadanos.
(d) Se trate de la identidad de un confidente.
(e) Sea información oficial conforme a las Reglas de Evidencia, Ap. VI del Título 32.
(f) Se revelen técnicas o procedimientos de investigativos. 3 LPRA sec. 292j.
A su vez, es la política pública del Estado Libre Asociado “proveer protección y asistencia a las víctimas y testigos en los procesos judiciales y en las investigaciones”, 25 LPRA see. 973, razón por la cual la Asamblea Legislativa adoptó la Carta de Derechos de las Víctimas y Testigos de Delito, Ley Núm. 22 de 22 de abril de 1988 (25 LPRA see. 973 et seq.) Contrario a lo que argumentan los peticionarios, la Carta de Derechos de las Víctimas y Testigos no garantiza de forma alguna la confidencialidad de la investigación realizada por la Diócesis, sino que protege la confidencialidad de la información en posesión del Estado durante los procesos investigativos y judiciales. De igual forma, el Secretario de Justicia tiene el deber de proteger a las víctimas y a los testigos mientras ejerce sus poderes delegados. 3 LPRA sec. 292o. En aras de cumplir con esta política pública, el Departamento de Justicia creó el Reglamento para establecer las normas de divulgación de información obtenida como resultado de investigaciones realizadas por el Departamento de *355 Justicia, Reglamento Núm. 7450 de 4 de enero de 2008 y el Reglamento sobre divulgación de información de interés público custodiada por el Departamento de Justicia de 17 de octubre de 2007. La existencia de estas leyes y reglamentos demuestra que el Estado, de ser necesario, cuenta con múltiples herramientas para proteger la confidencialidad y evitar la divulgación innecesaria de cualquier información que obtenga mediante los subpoenas. Cómo el Estado maneje o divulgue esa información —y las responsabilidades y obligaciones que de ello emanan— es un asunto más allá de la controversia que hoy atendemos.
C
Relacionado también con el derecho a la intimidad, los peticionarios, como los representantes de más alta jerarquía en la Diócesis de Arecibo, alegan que esta ostenta un derecho a la intimidad sobre los documentos requeridos por el Departamento de Justicia por estos estar relacionados a su dogma, fe y gobierno interno, de manera tal que se activa la protección contra registros y allanamientos irrazonables. Argumentan que esa protección requiere que el Estado justifique la emisión de los subpoenas demostrando la existencia de causa probable, pues se trata de una investigación de índole criminal. A pesar de que reconocemos que la Diócesis tiene un derecho a la intimidad sobre los documentos relacionados a su investigación interna, los peticionarios se equivocan al alegar que el Estado tenía que demostrar causa probable para emitir los subpoenas. Veamos.
El Departamento de Justicia es el departamento ejecutivo responsable de cumplir una de las responsabilidades esenciales de la Rama Ejecutiva: velar por el cumplimiento de la ley. Exposición de Motivos de la Ley Núm. 205 de 9 de agosto de 2004 (3 LPRA secs. 291-296h). Esta obligación le fue delegada de acuerdo con nuestra Constitución y juega *356 un papel fundamental en el diseño de nuestra constitución republicana. A su vez, estas responsabilidades recaen sobre el Secretario de Justicia, nombrado por el Gobernador por disposición constitucional para dirigir el Departamento de Justicia. Sees. 5 y 6, Art. IV, Const. PR, LPRA, Tomo 1; 3 LPRA see. 292.
Considerando la importancia de las funciones que desempeña el Secretario de Justicia, la Asamblea Legislativa le concedió amplias facultades investigativas para cumplir con la política pública de detectar, combatir y prevenir la delincuencia. Entre estas facultades otorgadas al Secretario de Justicia se encuentra el poder de extender citaciones y requerir la presentación de evidencia documental y aquella que se considere esencial para el conocimiento cabal de los asuntos que investiga. 3 LPRA sec. 292h. No obstante, hemos expresado que el “ejercicio [de ese poder] no queda al margen de los postulados constitucionales que informan nuestro ordenamiento”. H.M.C.A. (P.R.), Inc., etc. v. Contralor, 133 DPR 945, 969 (1993). En lo pertinente, la Sección 10 del Artículo 2 de nuestra Constitución, supra, al igual que la Cuarta Enmienda de la Constitución de Estados Unidos, protege a los individuos contra citaciones irrazonables de agencias administrativas. H.M.C.A. (P.R.), Inc., etc. v. Contralor, supra, pág. 96. Véase Oklahoma Press Pub. Co. v. Walling, 327 US 186 (1946). Por lo tanto, cuando se está ante un requerimiento de documentos por una institución gubernamental, que tiene la facultad de compeler a personas a suministrar información, como lo es el Departamento de Justicia, se debe examinar la razonabilidad del requerimiento a la luz de tres factores: (1) que la investigación que lleve a cabo la agencia esté en la autoridad conferida por ley; (2) que el requerimiento no sea demasiado indefinido, y (3) que la información solicitada sea razonablemente pertinente al asunto específico bajo investigación. H.M.C.A. (PR.), Inc., etc. v. Contralor, supra, págs. 968-970. Si hay terceros que puedan abrigar un derecho a la intimidad sobre *357 los documentos requeridos, este Tribunal ha establecido que la institución tiene que notificar al agraviado, o en la alternativa, exigir los documentos a través de una orden judicial. Loubriel, Suazo, supra, pág. 380.
D
Al emitir los subpoenas, el Departamento de Justicia le requirió a la Diócesis que suministrara los nombres, direcciones y demás información relacionada a los querellantes, las alegadas víctimas de delitos sexuales y los individuos alegadamente responsables de cometer los abusos. De igual forma solicitaron información sobre cómo la Diócesis atendió las querellas.(7)
Habiendo expuesto los factores que se deben examinar para determinar si el requerimiento de documentos fue razonable, entendemos que los requerimientos de información que extendió el Departamento de Justicia fueron válidos, pues lo expidió para cumplir con su deber de investigar la comisión de alegados delitos sexuales cometidos por sacerdotes de la Diócesis. No hay duda de que esta investigación está autorizada bajo nuestro ordenamiento. En cuanto a los demás criterios a considerar, entendemos que los subpoenas no fueron indefinidos, vagos o imprecisos, y lo requerido era razonablemente pertinente al asunto bajo investigación, pues se circunscribió a las investigaciones realizadas por la propia Diócesis sobre alegados delitos sexuales cometidos por sacerdotes. Valga aclarar que el Estado no tenía que notificar la emisión de los subpoenas a las víctimas, ya que estas no tienen un derecho a la intimidad sobre los hechos constitutivos de delito, como concluimos previamente.
De igual forma, y aún más preocupante, la Diócesis argumenta que algunas de las querellas que investigó fueron *358 actos consensúales que no están prohibidos por el Código Penal, mientras que otras que sí podrían cumplir con los elementos de algún delito, pero han prescrito. Por ende, sostienen que el Estado no tiene un interés válido en investigar la conducta de los sacerdotes expulsados. Al plantear esos argumentos, la Diócesis se adscribe un poder que es de la prerrogativa exclusiva del Estado, pues nadie salvo los actores responsables en cada rama gubernamental tienen capacidad para concluir que una conducta no cumple con los elementos delictivos o que el delito ha prescrito. La Diócesis no puede ser juez y parte a la vez.
Cuando la agencia que hace el requerimiento está investigando la comisión de un delito, si bien no se requiere un estándar de causa probable, sí se requiere el cumplimiento estricto de los factores previamente mencionados. Weber Carrillo v. ELA et al., supra, pág. 714. Por lo anterior, los subpoenas solicitados a la Diócesis de Arecibo por medio del Obispo Daniel Fernández Torres y el Vicario General, Luis Colón Rivera, son válidos y no infringen sobre el derecho a la intimidad de los peticionarios, según protegido por la See. 10 del Art. 2 de nuestra Constitución.
E
Contrario a lo anterior, hoy una mayoría de este Tribunal concluye que las víctimas mayores de edad tienen una ex-pectativa razonable de intimidad sobre la información que comunicaron al Vicario en el curso de la investigación de la Diócesis. Según razona la opinión de conformidad, la sociedad reconoce que las alegadas víctimas mayores de edad poseen una expectativa objetiva de intimidad sobre la investigación, porque si se llega a divulgar la información que comunicaron a la Diócesis quedarían expuestos al escarnio público de forma tal que recibirían un trato injusto e indigno por parte de la sociedad. Expresan que “[mjuchos podrían culpar a las víctimas por los hechos y levantar sospechas *359 sobre sus vidas íntimas” e imaginan “la humillación que revivirá [el joven interventor] si la Iglesia Católica revela que fue una de las víctimas de abuso sexual. Luego de haber superado el proceso, lo obligaríamos a revivir cada uno de esos momentos dolorosos, con todo lo que ello implica”. Opinión de conformidad, pág. 324.
A pesar de que entendemos que las supuestas víctimas no albergan una expectativa razonable de intimidad sobre los hechos de los delitos que investiga el Estado, coincidimos con la opinión de conformidad en que las víctimas tienen una expectativa de intimidad sobre cómo el Estado manejará la información que requirió de la Diócesis. Sin embargo, esa no es la controversia ante nuestra consideración. No nos corresponde pasar juicio sobre la posibilidad de que el Estado divulgue los detalles de un delito, sino sobre la validez de unos subpoenas emitidos durante una investigación criminal que el Estado tiene el deber de manejar responsablemente. Por lo tanto, la opinión de conformidad se equivoca al sustentar su determinación en que las salvaguardas que proveen las leyes y reglamentos que rigen el Departamento de Justicia “resultan insuficientes” para protegerlos de esta divulgación hipotética y especulativa.
Para concluir que existe una expectativa de intimidad, la mayoría utiliza como fundamento que anteriormente este Tribunal ha otorgado protección a información económica y financiera en manos de terceros. Sin embargo, existe una diferencia con respecto a la naturaleza de la información solicitada en esos casos y la controversia ante nosotros. En aquellas ocasiones reconocimos una expectativa razonable de intimidad porque la información solicitada por el Estado fue suministrada a los terceros para un propósito particular, limitado, y porque podría revelar detalles sobre la persona que serían superfinos al propósito de la investigación. En este caso estamos ante información de una naturaleza muy diferente: hechos alegadamente constitutivos de delitos.
*360 Si bien reconocemos una expectativa de intimidad sobre los estados bancarios y las planillas presentadas, esa ex-pectativa no se extiende a los hechos delictivos en sí, sean la firma de un cheque fraudulento o el hecho de proveer información falsa en una planilla. A modo de ejemplo, en RDT Const. Corp. v. Contralor I, 141 DPR 424 (1996), el Tribunal determinó que existe una expectativa de intimidad sobre la información que las instituciones bancarias poseen de sus clientes debido a que es necesario recurrir a las instituciones bancarias para participar en la vida económica y estas requieren información que revela los patrones y estilos de vida de sus clientes. Por ejemplo, mediante esa información se puede determinar
[...] la ocupación de la persona investigada, los lugares que frecuenta, los bienes que adquiere, a qué partido o grupo político contribuye, los periódicos y las revistas que lee con frecuencia, la iglesia a la cual hace donativos, las asociaciones a las cuales pertenece, las tiendas y los establecimientos donde compra, los médicos que visita y otra información de naturaleza intima. íd., págs. 441-442.
Por fundamentos análogos a los expresados en RDT Const. Corp. v. Contralor I, supra —el tipo y gran variedad de la información que contienen los documentos en función del propósito por el cual se solicita— también hemos concluido que existe una expectativa razonable de intimidad sobre las planillas de contribución sobre ingresos y sobre el registro de llamadas telefónicas. Rullán v. Fas Alzamora, 166 DPR 742 (2006); Weber Carrillo v. ELA et al., supra.
En este caso los peticionarios no han detallado cómo la entrega de documentos específicos violaría su derecho a la intimidad, si existe información no relacionada a la conducta sexual presuntamente constitutiva de delito o qué detalles adicionales a los hechos delictivos revelaría la información solicitada. Los peticionarios no han hecho más que reclamar a grandes rasgos una expectativa de intimidad sobre la totalidad de la investigación de la Diócesis, porque versa sobre su conducta sexual. Nuevamente nos *361 preguntamos, ¿por qué se les debe conceder a los peticionarios un segundo turno para subsanar sus argumentos y la evidencia que presentaron ante el Tribunal de Primera Instancia?
Habiendo determinado erróneamente que existe una ex-pectativa de intimidad sobre la información en controversia, la opinión de conformidad utiliza dos factores para concluir que en este caso el derecho a la intimidad de las alegadas víctimas va por encima del poder de investigación del Estado: la naturaleza sexual de la información comunicada durante la investigación y la promesa de confidencialidad que realizó la Diócesis. En este caso, la información de naturaleza sexual constituye conducta presuntamente delictiva sobre la cual, como señalamos, no existe una ex-pectativa objetiva de intimidad precisamente porque el Estado tiene la obligación de encausar y penalizar esa conducta. Por otro lado, apoyarse en la promesa de confidencialidad de la Diócesis abre la puerta a que en un sinnúmero de situaciones análogas se limite tajantemente el poder del Estado para investigar la comisión de delitos y encausar a los responsables en nombre del Pueblo. La conclusión de la opinión de conformidad se presta para ser abusada en relaciones donde exista una desventaja de poder entre las partes, y coarta el poder del Estado para investigar y procesar situaciones de violencia doméstica y otros tipos de abuso sexual.
Siguiendo la confusión doctrinal que enmarca su opinión, la mayoría ordena como remedio que sea la Diócesis quien notifique el requerimiento de información a las víctimas y querellantes de forma tal que puedan oponerse a la entrega. De negarse, la Diócesis sencillamente no podrá entregar la información solicitada. La opinión de conformidad justifica este curso de acción novedoso tras entender que estamos ante una situación inusitada en nuestro ordenamiento, pues en otras ocasiones donde el Estado ha solicitado información en manos de terceros el Estado cono *362 cía los nombres de los afectados y tenía la obligación de notificarles los requerimientos. Sin embargo, debido a que en este caso el Estado no conoce el nombre de esos individuos, la mayoría resuelve que será la Diócesis quien notificará el requerimiento a las víctimas e informará su oposición al Tribunal de Primera Instancia en un término razonable. Este mecanismo suscita graves dudas sobre su adecuación y eficacia. ¿Quién supervisará el cumplimiento? ¿Quién mismo tiene que cumplir?
Además, contrario a lo resuelto por una mayoría de este Tribunal, de existir una expectativa razonable de intimidad lo que procedería sería analizar el requerimiento de información por parte del Estado a la luz de los criterios previamente esbozados en la jurisprudencia citada por la propia mayoría: (1) que la agencia tenga la autoridad para llevar a cabo la investigación; (2) que el requerimiento no sea demasiado indefinido, y (3) que lo solicitado sea razonablemente pertinente al asunto bajo investigación. En RDT Const. Corp. v. Contralor I, supra, Rullán v. Fas Alzamora, supra, y Weber Carrillo v. ELA et al., supra, el Tribunal no resolvió que como existía un derecho a la intimidad sobre los documentos en controversia lo que procedía era obtener el consentimiento de la persona, sino que esta debe tener la oportunidad de impugnar el requerimiento para que el Tribunal determinara si era razonable. El derecho a la intimidad no es absoluto y, contrario a la conclusión de la mayoría, la víctima no tiene que consentir a la entrega de los documentos e información solicitada cuando el requerimiento cumple con los criterios que hemos reafirmado en numerosas ocasiones.
A su vez, la manera como la opinión de conformidad caracteriza el impacto que tendrá el proceso criminal sobre las alegadas víctimas socava la legitimidad de este Tribunal frente al Pueblo. Cuando se comete un delito, la víctima no es el único sujeto que sufre un agravio; también sufre el Pueblo de Puerto Rico, pues la conducta delictiva lacera los *363 entendidos básicos de nuestra sociedad. Es precisamente por eso que nuestra Constitución delega en el Estado Libre Asociado de Puerto Rico la responsabilidad colectiva de hacer velar por el cumplimiento de nuestros entendidos fundamentales al encomendarle definir qué constituye conducta delictiva, investigar su comisión e iniciar la acción penal. Ello es responsabilidad exclusiva del Estado. Lamentablemente, hoy la mayoría avala un intento por parte de unos pocos de investirse de ese poder bajo el manto del derecho a la intimidad y la libertad de culto.
IV
Tras concluir que los subpoenas emitidos contra el Obispo y el Vicario no transgreden el derecho a la intimidad de las víctimas y la propia Diócesis, pasemos a evaluar los reclamos de los peticionarios al amparo de la protección constitucional de separación entre Iglesia y Estado.
A
La Sección 3 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico, LPRA, Tomo 1, ed. 2008, pág. 280, establece que “[n]o se aprobará ley alguna relativa al establecimiento de cualquier religión ni se prohibirá el libre ejercicio de culto religioso. Habrá completa separación de la iglesia y el estado”. La primera oración de la Sección 3, al igual que la Primera Enmienda de la Constitución de Estados Unidos, consagra la libertad de culto (“cláusula de libertad de culto”) y prohíbe que el Estado establezca una religión oficial (“cláusula de establecimiento”). Mercado, Quilichini v. U.C.P.R., 143 DPR 610 (1997); Asoc. Academias y Col. Cristianos v. E.L.A., 135 DPR 150 (1994); Agostini Pascual v. Iglesia Católica, 109 DPR 172 (1979). La segunda oración refuerza la idea subyacente en la protección a la libertad de culto y la prohibición contra el establecimiento *364 de una religión oficial: la separación entre la Iglesia y el Estado. Agostini Pascual, supra, pág. 175. Véase, además, A. Fernós Isern, Original Intent in the Constitution of Puerto Rico, 2da ed., San Juan, Ed. LexisNexis, 2002, pág. 36.(8)
Por un lado, la cláusula de establecimiento "es una prohibición amplia en contra de la ayuda o el auspicio estatal a religión alguna, a todas las religiones o a la preferencia de una religión sobre otra”. Mercado, Quilichini v. U.C.P.R., supra, págs. 635-636. Una actuación estatal viola esta cláusula si: (1) no posee un propósito secular, sino religioso; (2) su efecto primordial es promover o inhibir una religión, o (3) conlleva una intromisión {entanglement) excesiva del estado con la religión.(9) Lemon v. Kurtzman, 403 U.S. 602, 612-613 (1971). Véase, además, J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales, Bogotá, Ed. Temis, 2009, pág. 1194.
Por otro lado, la cláusula de libertad de culto garantiza la práctica, individual o colectiva, de las creencias religiosas. *365 Díaz v. Colegio Nuestra Sra. del Pilar, 123 DPR 765, 778 (1989). En repetidas ocasiones hemos señalado que si bien la libertad de credo es absoluta, la libertad de actuar conforme a las creencias religiosas tiene sus limitaciones.(10) íd., pág. 778; Mercado, Quilichini v. U.C.P.R., supra, pág. 636. Por ejemplo, en Sucn. de Victoria v. Iglesia Pentecostal, 102 DPR 20, 25 (1974), sostuvimos que la “libertad religiosa no es untura de inmunidad que releve a los profesantes de observar y respetar las leyes bajo las cuales se ha organizado la sociedad, y recogen en sus preceptos los principios de paz, de la moral y de orden público”. De lo contrario, “le estaría vedado al Gobierno hacer respetar las leyes de protección social”. Mercado, Quilichini, supra, pág. 636. De manera similar se ha expresado el Tribunal Supremo de Estados Uni-dos al señalar como sigue:
We have never held that an individual’s religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate [...] “The mere possession of religious convictions which contradicts the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities”. Employment Div. v. Smith, 494 US 872, 878-879 (1990), citando a Minersville School Dist. v. Gobitis, 310 US 586, 594-595 (1940).
Principalmente, la cláusula de libertad de culto se ha invocado: (1) cuando el gobierno prohíbe una conducta que determinada religión exige; (2) cuando el gobierno exige una conducta que determinada religión impide, o (3) cuando una legislación vulnera o dificulta la posibilidad de cumplir con exigencias religiosas. Chemerinsky, op. cit, pág. 1247. En caso de que el Estado promueva algún fin estatal legítimo pero en tal acción afecte adversamente la práctica de una religión, la garantía constitucional requiere que, en algunas situaciones, se hagan concesiones para permitir el libre ejer *366 cicio de tales creencias religiosas. Mercado, Quilichini v. U.C.P.R., supra, pág. 637; Asoc. Academias y Col. Cristianos v. E.L.A., supra, pág. 161.
No obstante, no todas las acciones del Estado que inciden sobre la práctica de una religión requieren que el Estado acomode las creencias religiosas. Díaz v. Colegio Nuestra Sra. del Pilar, supra, pág. 778. La cláusula de libertad de culto exige un balance de intereses entre el interés del Estado y el efecto de la acción estatal sobre la práctica religiosa. En particular, para determinar si una actuación del Estado que impone una carga sobre una práctica religiosa es válida y se requiere un acomodo, es necesario evaluar: (1) la acción estatal; (2) el interés o propósito de la acción, y (3) el efecto que tiene sobre determinada práctica religiosa, Lozada Tirado et al. v. Testigos Jehová, 177 DPR 893, 914 (2010).
Así, al adoptar el estándar adjudicativo desarrollado por la jurisprudencia del Tribunal Supremo de Estados Unidos, hemos sostenido que si la acción estatal es neutral y de aplicación general, aun cuando tenga el efecto incidental de imponer una carga sobre una práctica religiosa, no tiene que estar justificada por un interés apremiante del Estado, Lozada Tirado et al. v. Testigos Jehová, supra, pág. 914, citando a Employment Div. v. Smith, 494 US 872 (1990).(11) En cambio, si la actuación del Estado no cumple con los requisitos de neutralidad y generalidad, el Estado debe demostrar que la acción o medida responde a un interés estatal apremiante y que se ajusta rigurosamente al interés apremiante que se pretende adelantar, esto es, que no existe un medio menos oneroso para ese interés, Lukumi Babalu Aye, Inc. v. Hialeah, 508 US 520, 531-532 (1993). De lo con *367 trario, el Estado deberá permitir un acomodo a la práctica religiosa.
Adviértase que la parte que alega que se le ha violado su libertad de culto es quien tiene el peso de la prueba de demostrar cómo la acción estatal viola sustancialmente el libre ejercicio de su religión. Asoc. Academias y Col. Cristianos v. E.L.A., supra, pág. 161. De ordinario, una carga mínima impuesta por el Estado no será suficiente para invocar exitosamente la garantía sobre la libertad de culto. íd.
B
Los peticionarios presentan dos cuestionamientos al amparo de las cláusulas religiosas: (1) que el Estado exige una conducta que los dogmas y principios sacramentales de la religión católica impiden y (2) que el Estado se involucra excesivamente con un asunto interno de la iglesia. La primera es una alegación al amparo de la libertad de culto; la segunda, al amparo de la cláusula de establecimiento. Procedemos a analizar ambas por separado.
Los peticionarios sostienen que la entrega o divulgación de información o documentación al Departamento de Justicia implicaría un quebrantamiento sustancial de las nor-mas, dogmas y principios sacramentales de la fe católica. Señalan que para la religión católica, los principios y las garantías de intimidad, privacidad y dignidad humana son derechos de los fieles católicos consustanciales al ejercicio de su fe y proveer la información solicitada, obtenida bajo un procedimiento privado y confidencial, les obligaría a quebrantar sus dogmas religiosos. Por tal razón, en virtud de la cláusula de libertad de culto, exigen que, en el balance de intereses, se le conceda un acomodo de tal suerte que no tengan que proveer la información solicitada mediante los subpoenas.
Previo a considerar los méritos de este planteamiento, precisa señalar que al evaluar una reclamación al amparo *368 de la libertad de culto los tribunales estamos impedidos de adentrarnos en determinaciones sobre qué constituye una práctica o creencia religiosa plausible. Véase U.S. v. Ballard, 322 US 78 (1944). Así, por ejemplo, el más alto foro de Estados Unidos ha sostenido que:
“[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants’ interpretations of those creeds.” Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim. Employment Div. v. Smith, supra, pág. 887, citando a Hernandez v. C.I.R., 490 US 680, 699 (1989).
Por tal razón, consideramos que, en efecto, la solicitud de la información y los documentos solicitados incide de alguna manera con la práctica religiosa alegada por los peticionarios, a saber: las comunicaciones privadas o confidenciales en el curso de una investigación eclesiástica. No obstante, según advertimos, el mero hecho de que una acción estatal incida sobre una organización o práctica religiosa no implica que tal actuación sea inválida a la luz de la cláusula de libertad de culto. Mercado, Quilichini v. U.C.P.R., supra, pág. 640.
En este caso, el requerimiento de los subpoenas responde a una actuación neutral y general del Estado supeditada al propósito secular de velar por el cumplimiento de las leyes. En específico, el Estado diligenció los subpoenas impugnados como parte de una investigación criminal sobre la posible comisión de los delitos de agresión y abuso sexual contra menores. Es decir, hay dos intereses principales tutelados por el Estado: la seguridad de la ciudadanía y el bienestar de los menores. Por tal razón, aunque supusiéramos que la acción del Estado incide sobre la práctica religiosa alegada, ese efecto es incidental al ejercicio de una acción válida y puramente secular del Estado.(12)
*369 Por su parte, los peticionarios sostienen que permitir la entrega de la información y documentación solicitada constituiría una intromisión excesiva con un procedimiento interno de la iglesia. Además, surtiría un efecto disuasivo {chilling effect) sobre las víctimas y los testigos para que denuncien el tipo de conducta objeto de este pleito, interfiriendo así con los procedimientos eclesiásticos de la Iglesia. Por lo tanto, implícitamente plantean que el Estado viola la cláusula de establecimiento. Entendemos que no.
Las cláusulas de establecimiento y de separación de Iglesia y Estado no implican que al Estado le esté vedado interferir absolutamente con asuntos de la Iglesia. Lo determinante es si la actuación del Estado responde primordialmente a un interés secular. El propósito de la acción impugnada en esta controversia es el requerimiento de información y documentación para investigar la comisión de *370 delitos. Tal acción es enteramente secular y no busca pro-mover o inhibir la práctica de la religión católica. Tampoco representa una intromisión indebida con asuntos internos de la iglesia. Mediante la expedición de los subpoenas, el Estado no interfiere o intenta interferir con la potestad investigativa de la Iglesia, como tampoco con las determinaciones o medidas disciplinarias tomadas internamente contra los sacerdotes. Por lo tanto, el efecto que tiene la acción estatal sobre las investigaciones eclesiásticas, si alguno, es meramente incidental al ejercicio válido del Estado en el cumplimiento de su deber. Según lo anterior, coincidimos con el Tribunal de Primera Instancia en que los subpoenas impugnados no violan las cláusulas religiosas.
C
Hoy una mayoría de este Tribunal se convierte en un tribunal de derecho canónico y pasa juicio sobre la validez de una práctica fundamentada en una creencia religiosa. Esto es, la opinión de conformidad pasa juicio sobre las nor-mas internas de la Iglesia Católica sobre la entrega de documentación en casos que pudieran constituir maltrato o abuso sexual de menores y concluye que —a base de la interpretación que realiza la mayoría sobre el derecho canónico de la Iglesia Católica— los peticionarios estaban obligados a entregar toda información sobre una víctima si al momento de su denuncia la víctima era menor de edad.(13) Por lo tanto, concluyen que conforme a su interpretación sobre las reglas internas de la Iglesia y el derecho canónico, no existe conflicto entre la práctica religiosa alegada y la información solicitada por el Estado sobre víctimas menores de edad al momento de la denuncia, por lo que esta información debe ser entregada. Respecto a la información soli *371 citada sobre víctimas que eran mayores de edad al momento de la denuncia, la opinión de conformidad interpreta que las reglas internas de la Iglesia Católica no exigen que la parte demandante las entregue. Por consiguiente, sobre esa información la parte demandante está cobijada por la protección constitucional sobre la libertad de culto.
Esta determinación es jurídicamente incorrecta. Primero, la opinión de conformidad sostiene que debido a que no existe conflicto entre la libertad de culto y la información solicitada por el Estado sobre víctimas menores de edad al momento de la denuncia, esa información debe ser entregada. Acto seguido, sostiene que sobre las víctimas que al momento de presentarse las denuncias eran mayo-res de edad sí existe un conflicto entre la libertad de culto y la información requerida por el Estado. Sobre estas víctimas concluye que les cobija la libertad de culto y el Estado debe probar que no existían medios menos onerosos para obtener la información solicitada.
No obstante a lo anterior, al analizar el derecho a la intimidad la opinión de conformidad concluye que las víctimas que eran mayores de edad al momento de la denuncia están cobijadas por el derecho a la intimidad, por lo que estas deben otorgar su consentimiento a la entrega de la información solicitada por el Estado. Nada menciona sobre el derecho a la intimidad de las víctimas menores de edad al momento de la denuncia, manteniendo su determinación de que como no hay conflicto entre la libertad de culto y la información requerida por el Estado sobre estas, la información debe ser entregada.
¿Acaso la mayoría considera que a las víctimas menores de edad al momento de la denuncia no les cobija el derecho a la intimidad, tal cual le cobija a las que eran mayores de edad al momento de la denuncia? O, por el contrario, ¿que los dogmas y creencias religiosas de una institución tienen primacía sobre el derecho a la intimidad de las víctimas que eran menores de edad al momento de la denuncia y por ello *372 debe entregarse la información solicitada al no haber conflicto entre el Estado y la Iglesia?
Segundo, al entrar a interpretar veracidad o corrección de los dogmas y creencias religiosas en los que se fundamentan los peticionarios, la opinión de conformidad se distancia de las normas básicas de limitación judicial al atender cuestiones sobre creencias y prácticas religiosas. Sobre este asunto, en U.S. v. Ballard, 322 US 78, 86 (1944), el Tribunal Supremo de Estados Unidos estableció que los individuos “may not be put to the proof of their religious doctrines or beliefs”. Repetimos lo señalado por el más alto foro estadounidense: “[it] is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants’ interpretations of those creeds”. Smith, supra, pág. 887 citando a Hernandez v. Commissioner, 490 US 680, 699 (1989). A su vez, ese mismo foro ha puntualizado que:
The determination of what is a “religious” belief or practice is more often than not a difficult and delicate task [...] However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection. Thomas v. Review Bd. of Indiana Employment Sec. Division, 450 US 707, 714 (1981).
Por ende, no le corresponde a este Tribunal pasar juicio, cual si fuera un tribunal de derecho canónico, sobre si la creencia o práctica religiosa en que los peticionarios fundamentan su reclamo de libertad de culto se encuentra validada por las reglas internas de la Iglesia Católica; mucho menos, como señalamos, utilizar las creencias religiosas de una religión como fundamento jurídico para adjudicar parte de esta controversia. Dicho sea de paso, tal intervención por parte de este Tribunal constituye una intromisión indebida del Estado con una religión en violación a las cláusulas religiosas, pues pasa juicio sobre la veracidad de la creencia religiosa de los peticionarios.
*373 D
Por su parte, habiendo resuelto que la información solicitada por el Estado sobre víctimas menores de edad al momento de la denuncia debe ser entregada, la opinión de conformidad pasa a analizar la información solicitada sobre víctimas mayores de edad al momento de la denuncia. Sobre estas concluye que la actuación estatal sí le impuso una carga sustancial sobre el ejercicio de su religión pues, como mencionamos, según la interpretación del derecho canónico que hace la mayoría, sobre esta información las reglas internas de la Iglesia Católica no compelían a los peticionarios a entregar la información a las autoridades. Al evaluar la carga impuesta por el Estado y determinar el escrutinio aplicable a estos hechos, la Opinión de conformidad escuetamente sostiene que la emisión de un subpoena cumple con el requisito de neutralidad más no con el requisito de aplicabilidad general y, por ende, procede aplicar el escrutinio estricto a esta controversia.
Según la opinión de conformidad, debido a que los subpoenas emitidos por el Estado pretenden requerir información producto de un procedimiento interno de la Iglesia, la actuación estatal no satisface el criterio de aplicación general. Es decir, como en este caso los subpoenas se dirigen exclusivamente a la Iglesia y a requerir información a su haber, no son de aplicación general. Este raciocinio no guarda relación jurídica alguna con el análisis del criterio de aplicación general desarrollado por la jurisprudencia y nos conduce a un absurdo jurídico. Veamos.
El criterio de aplicabilidad general pretende evitar que una ley, a través de su diseño, construcción o aplicación, discrimine contra el ejercicio de una práctica o creencia religiosa. Lukumi Babalu Aye, Inc., supra, pág. 557 (Scalia, J., Opinión Concurrente). En palabras del profesor Richard F. Duncan:
[T]he “precise evil” prohibited by the general applicability re *374 quirement is the inequality that results when underinclusive legal prohibitions are enforced against religious conduct. When society is unwilling to impose the same legal restrictions on favored secular activities that it imposes on religious practices of the same kind, that “evil” is present and renders the constitutionality of the legal scheme doubtful. R.F. Duncan, Free exercise is dead, long live free exercise: Smith, Lukumi and the general applicability requirement, 3 U. Pa. J. Const. L. 850, 867 (2001).
Como bien reconoció el Tribunal Supremo de Estados Unidos en Lukumi Babalu Aye, Inc., supra, págs. 542-543, citando a Hobbie v. Unemployment Appeals Comm’n of Fla., 480 US 136, 148 (1987):
All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice. The Free Exercise Clause “protect [s] religious observers against unequal treatment,” and inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation. (Citas omitidas y énfasis nuestro).
Por lo tanto, al evaluar un cuestionamiento al amparo de la libertad de culto sobre el criterio de aplicabilidad general, la encomienda de un tribunal no es auscultar si en determinada ocasión una ley se aplicó contra una actividad religiosa, sino evaluar si el diseño, construcción o aplicación de la ley incide únicamente sobre una práctica religiosa en virtud exclusiva de su naturaleza religiosa. Si la carga impuesta por el Estado únicamente es a la actividad por su naturaleza religiosa, la actuación estatal no cumplirá con el criterio de aplicabilidad general y procederá aplicar el escrutinio estricto. Véase C.M. Kaplan, The Devil Is in the Details: Neutral, Generally Applicable Laws and Exceptions from Smith, 75 N.Y.U. L. Rev. 1045, 1075-1083 (2000). En cambio, si la carga impuesta aplica tanto a prácticas o actividades seculares como a prácticas o actividades religiosas, procederá aplicar el escrutinio racional.
En la controversia ante nuestra consideración, el Secre *375 taño de Justicia está facultado por una ley de aplicación general para requerirle a un ciudadano o una entidad la presentación de evidencia que considere esencial para el curso de una investigación del Departamento de Justicia. En relación a los hechos de este caso, el Secretario está facultado para emitir subpoenas para requerir información en el curso de una investigación sobre la posible comisión de delitos. Los subpoenas, por su naturaleza, son dirigidos de manera individualizada. No obstante, el requerimiento de información mediante éste no pretende incidir sobre la práctica de una religión de manera distinta a la que incidiría sobre la práctica de una actividad secular. Esto es, la carga impuesta de un subpoena a que una entidad religiosa entregue ciertos documentos en el curso de una investigación criminal es la misma carga que se le impondría a una entidad secular en similares circunstancias.
En su consecuencia, si bien en este caso en particular los subpoenas fueron dirigidos a la Iglesia para requerirle información producto de una investigación de esta institución, con tal requerimiento el Estado no está imponiéndole una carga a la Iglesia que no le impondría a una entidad secular. De hecho, en nuestro ordenamiento los subpoenas son utilizados frecuentemente por las distintas agencias de gobierno para requerirle información a entidades seculares sobre sus asuntos internos. Consecuentemente, si mediante los subpoenas se incidió de alguna manera con la práctica religiosa de la Iglesia, tal efecto es meramente incidental a la aplicación general de una ley y no procede aplicar el escrutinio estricto a la actuación estatal.
La opinión de conformidad fundamenta su raciocinio principalmente en lo resuelto en Mercado, Quilichini v. U.C.P.R., supra. Allí sostuvimos que una parte no puede acudir ante los tribunales para solicitar que se invalide una determinación de una entidad religiosa motivada por los dogmas y creencias religiosas de la entidad. íd., pág. 649. En ese contexto, sostuvimos que la intervención del Tribu *376 nal (Estado) en esa disyuntiva requería pasar juicio sobre un asunto interno de la entidad religiosa que solo afectaría a esta última. Por tal razón, al analizar si un tribunal debía intervenir para pasar juicio sobre la determinación interna de la entidad religiosa motivada por sus dogmas y creencias religiosas, evaluamos nuestra intervención a la luz del escrutinio estricto por entender que esta incidiría únicamente sobre la determinación fundamentada en creencias religiosas de la entidad objeto del pleito.
Este caso no se trata de la facultad de un tribunal para intervenir en esta controversia; mucho menos de que mediante nuestra intervención tengamos que pasar juicio sobre la corrección en Derecho de una determinación interna de una entidad religiosa fundamentada en sus dogmas y creencias religiosas.(14) El Estado tampoco pretende pasar juicio sobre las determinaciones internas de la Iglesia o imponer su criterio sobre ellas. Los hechos en Mercado, Quilichini v. U.C.P.R., supra, evidentemente, distan significativamente de los hechos del caso ante nuestra consideración y del alcance que hoy, acomodaticiamente, quiere impartirle la mayoría a la frase “asuntos internos”.
Por todo lo anterior, evidentemente los subpoenas emitidos son una ley neutral de aplicación general, por lo que ahí debe terminar el análisis de este Tribunal. No obstante, aun si entendiéramos que procede el escrutinio estricto tal y como propone la opinión de conformidad, en este caso el Estado tiene un interés apremiante en conseguir la información plasmada en los expedientes de la investigación de la Diócesis y el mecanismo de subpoena es el método menos oneroso para conseguirla. Como han resuelto otras jurisdicciones, la información producida por la investigación de la Diócesis es de tal naturaleza que solo puede obtenerse, ne *377 cesariamente, mediante el estudio de los expedientes de la Diócesis sobre su investigación interna.(15)
La distinción que la opinión de conformidad intenta realizar sobre la jurisprudencia de otras jurisdicciones que han resuelto que los subpoenas no infringen sobre la libertad de culto es errada. El que en algunos casos análogos no exista un procedimiento establecido por las autoridades eclesiásticas es inmaterial para adjudicar reclamos bajo el derecho a la libertad de culto. Peor aún, en los casos que la opinión de conformidad intenta distinguir sí existían tales procedimientos internos y también se solicitó información sobre las víctimas.(16) Resolver lo contrario, como hace la *378 Opinión de conformidad, implica que para que opere el de recho a la libertad de culto se requiere cierta organización jerárquica que establezca procedimientos que formalicen las creencias de la religión. Tal determinación en sí, nuevamente, viola la cláusula de establecimiento, pues impone unos requisitos discriminatorios que no toda religión podrá cumplir. Según el criterio que hoy esboza la Opinión de conformidad, ¿qué ocurrirá cuando una religión que no comparte la misma organización formal de la Iglesia Católica levante los mismos reclamos?
Finalmente, la Opinión de conformidad evalúa de manera independiente el requerimiento del Estado en el que solicita información sobre cómo la Iglesia o las personas que intervinieron en la investigación interna de la Iglesia atendieron y resolvieron los asuntos investigados. Sobre ese requerimiento concluye que es excesivamente amplio, interfiere con los asuntos internos de la Iglesia y viola la libertad religiosa. Aunque no queda del todo claro cuál es el análisis constitucional que la mayoría aplica a este asunto, tal parece que la Opinión de conformidad señala que con este requerimiento el Estado viola la cláusula de establecimiento *379 pues representa una intromisión excesiva del estado con la religión.
La opinión de conformidad sostiene que mediante ese requerimiento el Estado pretende pasar un juicio valorativo sobre los procesos investigativos internos. Sin embargo, no hay un ápice de prueba que señale que tal información se solicita para que el Estado pase un juicio sobre las decisiones internas de la Iglesia. Tampoco lo hay para sostener que el Estado solicita tal información para intervenir o cambiar el curso de acción tomado por la Iglesia conforme a sus dogmas. En todo caso, una simple lectura del requerimiento del Estado revela que con la información requerida el Estado pretende obtener información para investigar la posible comisión de delitos por parte de los sacerdotes investigados, al igual que en el manejo de los asuntos investigados. Determinar qué delitos debe investigar el Estado es una tarea que le corresponde exclusivamente a éste.
Curiosamente, a pesar de señalar que con este requerimiento el Estado intenta pasar un juicio valorativo sobre las decisiones de la Iglesia o intervenir en éstas, la opinión de conformidad analiza con cierto detalle el delito de encubrimiento. En otras palabras, implícitamente reconocen que, con la información requerida, el Estado posiblemente intenta investigar la comisión del delito de encubrimiento. Lo que es peor, la opinión de conformidad adelanta su criterio en protección de la Iglesia y los que participaron en la investigación al sostener de antemano que en este caso no estamos ante la posible comisión del delito de encubrimiento por lo que no procedía que el Estado solicitara esta información. Todo esto sin que parte alguna presente o discuta tal argumento.
No le corresponde a este Foro, en esta etapa de los procedimientos, determinar qué delitos se cometieron o a quiénes procede absolver de la comisión de éstos. En esta etapa, y conforme a los asuntos planteados ante nuestra consideración, nos corresponde evaluar si el interés del Es *380 tado en requerir la información solicitada es intervenir con las determinaciones de la Iglesia. La respuesta es que no.
En fin, según hemos discutido, ausente planteamientos en derecho válidos, nos sostenemos en que procedía la entrega de la información solicitada por el Estado mediante los subpoenas. “Tristes tiempos estos en los que hay que luchar por lo que es evidente”.(17) Según lo anterior y con mucho pesar sobre la determinación que hoy emite una mayoría, disiento.

 M. de Cervantes Saavedra, Don Quijote de la Mancha, (Ed. IV Centenario), Madrid, Ed. Alfaguara, 2004, pág. 60.

 En su demanda la Diócesis no presentó planteamiento alguno sobre el privilegio religioso-creyente de la Regla 511 de Evidencia, 32 LPRA Ap. VI.

 El 2 de mayo el Tribunal de Apelaciones denegó ambas solicitudes.

 El texto de la actual Regla 511 de Evidencia, supra, no alteró sustancialmente el alcance del privilegio religioso-creyente, según establecido en la Regla 28 de Evidencia de 1979 (32 LPRAAp. Ill) y el inciso (3) del Art. 402 del Código de Enjuiciamiento Civil (32 LPRA see. 1734). Secretariado de la Conferencia Judicial y Notarial, Informe de las Reglas de Derecho Probatorio, pág. 280. Esta regla es casi idéntica al texto de la antigua Regla 28, pero utiliza los términos religioso y creyente en vez de sacerdote y penitente. Este cambio intenta ajustar el texto a uno más inclusivo, en armonía con las protecciones constitucionales de la libertad de culto y contra el establecimiento de religión, pues el texto de la Regla 28 sugería que el privilegio solo aplicaría a comunicaciones habidas en ritos análogos al sacramento de la confesión católica. Informe de las Reglas de Derecho Probatorio, pág. 280. No obstante, estos cambios no alteraron la doctrina del privilegio. Id.

 El privilegio religioso-creyente del Código de Evidencia de California se encuentra en las secciones 1030-1034. West’s Ann. Cal. Evid. Code Sec. 1030-1034. Con respecto al requisito de mantener la comunicación en secreto, la Sección 1032 del Código de Evidencia expone:
“As used in this article, ‘penitential communication’ means a communication made in confidence, in the presence of no third person so far as the penitent is aware, to a member of the clergy who, in the course of the discipline or practice of the clergy member’s church, denomination, or organization, is authorized or accustomed to hear those communications and, under the discipline or tenets of his or her church, denomination, or organization, has a duty to keep those communications secret”. West’s Ann. Cal. Evid. Code § Sec. Í032. http://www.leginfo.ca.gov/cgi-bin/ displaycode?section=evid & group = 01001-02000 & file=1030-1034

 Por ejemplo, la Regla 508 propuesta en el Proyecto de Reglas de Evidencia en junio de 1992 incluía el texto siguiente:
“Comunicación confidencial: comunicación hecha a un sacerdote, en su carácter profesional como consejero espiritual, en la confianza de que la misma no será divulgada a terceras personas, scdvo aquellas que sea necesario para llevar a cabo el propósito de la comunicación”. (Enfasis suplido). Informe del Proyecto de Reglas de Evidencia de junio de 1992, págs. 72-73.
De igual forma, la redacción del privilegio propuesta por el Comité de Reglas de Evidencia en 1986 dispone que se considerará como comunicación confidencial aquella realizada a un sacerdote, como consejero espiritual, “en la confianza de que la misma no será divulgada a terceras personas, salvo aquellas que sea necesario para llevar a efecto el propósito de la comunicación”. (Énfasis suplido). Comité de Reglas de Evidencia del Secretariado de la Conferencia Judicial, Primer examen de las Reglas de Evidencia de 1979: comentarios y recomendaciones, pág. 172. El lenguaje empleado en ambas propuestas del Comité contrasta marcadamente con el requisito de secreto pautado en la actual Regla 511. Éste se asemeja más a la regla uniforme federal, pues permite la divulgación a terceros en ciertas circunstancias.

 Como recogió el Tribunal de Primera Instancia en las determinaciones de hecho de su Sentencia de 7 de abril de 2014, la Diócesis ha detallado cómo realizó la investigación interna según el Procedimiento de la Conferencia Episcopal Puertorriqueña. Apéndice, pág. 28.

 Según hemos señalado, al interpretar la Sección 3 del Artículo 2, aunque podemos impartirle mayor protección a los ciudadanos que la que está dispuesta a reconocer el Tribunal Supremo de Estados Unidos, debemos ser particularmente cuidadosos en el reconocimiento de garantías adicionales para evitar malograr el equilibrio entre dos mandatos constitucionales inherentemente conflictivos: el deber de no establecer o promover una religión y el de no inhibir el libre ejercicio del culto religioso. Díaz v. Colegio Nuestra Sra. del Pilar, 123 DPR 765, 776 (1989).

 Al respecto, en su opinión disidente en el caso Academia San Jorge v. J.R.T., el entonces Juez Presidente Señor Trías Monge señaló que para que una legislación resista un ataque al amparo de la cláusula de establecimiento, ésta “debe tener un propósito secular, su efecto primario debe ser secular también y ella no debe promover una involucración excesiva con la religión”. Academia San Jorge v. J.R.T., 110 DPR 193, 229 (1980) (Trías Monge, J., Op. Disidente). Este estándar ha sido objeto de diversos debates entre los Jueces y Juezas del Tribunal Supremo de Estados Unidos, particularmente sobre el requisito de la intromisión excesiva. Véanse: S.M. Feldman, Divided we fall: religion, politics, and the Lemon entanglements prong, 7 First Amend. L. Rev. 253 (2009); J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales, Bogotá, Ed. Temis, 2009, pág. 1193.
No obstante, hoy sigue siendo el estándar aplicado en la mayoría de los casos que versan sobre la cláusula de establecimiento. E. Chemerinsky, Constitutional Law: Principles and Policies, 3ra ed., Nueva York, Ed. Wolters Kluwer Law and Business, 2006, pág. 1202.

 En términos similares se expresó el Tribunal Supremo de Estados Unidos en Reynolds v. United States, 98 US 145, 164 (1878), al señalar: “Congress was deprived of all legislative power over mere opinion, but was left to reach actions”.

 La determinación de adoptar el escrutinio establecido en Employment Div. v. Smith, contrasta, por ejemplo, con la determinación del Tribunal Supremo de Massachusetts en Attorney Gen. v. Desilets, 418 Mass. 316 (1994), de negarse a utilizar ese escrutinio al analizar la cláusula de libertad de culto de la Constitución de Massachusetts.

 En su alegato ante este Tribunal, los peticionarios plantean, por primera vez, que debido a que el reclamo de libertad de culto está acompañado de una alega *369 eión de que se ha violado también otra disposición constitucional —el derecho a la intimidad— procede que para adjudicar esta controversia se utilice el escrutinio estricto propio de las reclamaciones híbridas, según elaborado por el Tribunal Supremo de Estados Unidos en Employment Div. v. Smith, supra. El alegado escrutinio estricto propio de reclamaciones híbridas que señalan los peticionarios, en efecto surge a raíz de las expresiones del Tribunal Supremo de Estados Unidos en el caso de Employment Div. v.Smith. Allí, el más Alto Foro de Estados Unidos, al establecer la norma general de que en caso de que una legislación sea neutral y de aplicación general, el Estado no tiene que establecer un interés apremiante, señaló que:
“[t]he only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press [...] or the right[s] of parents”. íd., pág. 881.
Más adelante el Tribunal se negó a aplicar el escrutinio estricto al caso de Smith porque no presentaba la “situación híbrida” antes reseñada. (Traducción nuestra). íd., pág. 882. Por razón de la ambigüedad de las expresiones del Tribunal Supremo de Estados Unidos, esas expresiones han generado diversas interpretaciones en distintos foros judiciales sobre la aplicación de esa aparente excepción. Véase J.B. Hensley, Approaches to the hybrid-rights doctrine in free exercise cases, 68 Tenn. L. Rev. 119 (2000); S.H. Aden y L. J. Strang, When a “rule” doesn’t rule: the failure of the Oregon Employment Division v. Smith “Hybrid Rights Exception”, 108 Perm St. L. Rev. 573 (2004). Algunos foros incluso se han negado a aplicar esa excepción por entender que es obiter dictum. Véase Leebaert v. Harrington, 332 F.3d 134, 143 (2do Cir. 2003); Kissinger v. Bd. of Trs. of the Ohio State Univ., 5 F.3d 177 (6to Cir. 1993). No obstante, entendemos que este caso es innecesario que nos pronunciemos sobre la aplicación de las reclamaciones híbridas dado a que, según analizamos, la reclamación al amparo del derecho a la intimidad carece de méritos. Además, este es un planteamiento que se trae ante este Tribunal por primera vez, por lo cual es impropio dilucidarlo.

 Adviértase que esto implica un trato desigual para las víctimas en función de la edad que tenían al momento de presentarse la denuncia ante la Diócesis, independientemente de si era menor de edad al momento de los hechos que denuncia.

 Curiosamente, como señalamos, eso es precisamente lo que hizo la mayoría en este caso al pretender adjudicar parte de esta controversia fundamentándose en su interpretación y juicio sobre los dogmas y las creencias religiosas de la Iglesia Católica. Esto en clara contradicción con el testimonio presentado por el perito en derecho canónico traído al pleito por los peticionarios.

 por ejemplo, en Society of Jesus of New England v. Com., 441 Mass. 662, 672-673 (2004), la Corte Suprema Judicial de Massachusetts expresó siguiente:
“Talbot and the Jesuits argue that the Commonwealth may rely on ‘good police work’ to secure convictions in criminal cases, and that production of documents from religious organizations is not necessary to pursuit of the Commonwealth’s law enforcement goals. Again, however, we turn to the specifics of this case, not to general pronouncements about how law enforcement may be furthered by ‘good police work’. If, as the Commonwealth suspects, the withheld documents contain damaging admissions by Talbot, the utility of such evidence cannot be matched by ‘good police work’ [...] And, again assuming that damaging admissions are contained in the withheld materials, they are not useful solely for purposes of persuading a jury to convict — they can have a strong impact on plea negotiations, with the potential that two young victims of sexual abuse might be spared the ordeal of testifying in trial. We are satisfied that the Commonwealth has a compelling interest in obtaining these documents, that there are no other avenues by which the Commonwealth could obtain the equivalent of these documents, and that those interests outweigh the claimed interest of keeping these communications confidential”. (Éfasis suplido y citas omitidas).
Igualmente, en People v. Campobello, 348 Ill. App. 3d 619, 624 (2004), el Estado indicó que interesaba tales expedientes precisamente podían contener admisiones por parte de los sacerdotes investigados que revelaran conducta impropia con un menor de edad, información que no podría consegrar de otra forma.

 Por ejemplo, en People v. Campobello, supra, los informes producidos por la investigación interna de la Diócesis de Rockford sí contenían información sobre las víctimas, pues la investigación solicitó datos sobre la conducta impropia de los sacerdotes investigados.
Contrario a lo que se alega en la opinión de conformidad, en Campobello la Diócesis de Rockford sí tenía un procedimiento establecido para atender querellas de conducta sexual impropia de sacerdotes, titulado Sexual Misconduct with Minors: Norms for Educatuon, Prevention, Assistance to Victims and Procedures for Determination of Fitness for Ministry /Employment. Id., pág. 623.
En Campobello el Tribunal también reconoció que en el 2002 la Conferencia de Obispos de los Estados Unidos adoptó el Charter for the Protection of Children and Young People (Carta). Este documento ordena que “each diocese have a review board that functions as a confidential consultative body to the diocesan bishop to advise and assist him with respect to allegations of sexual abuse by clergy”, con el cual *378 cumplió el comité de la Diócesis que realizó su investigación interna. íd. Luego de señalar que los peticionarios no citaron autoridad alguna que indicara que una organización religiosa puede resistir un subpoena exclusivamente según sus creencias religiosas, el Tribunal expresó que
“[b]oth the substantive and procedural laws under which the State is prosecuting defendant and seeking discovery are unquestionable neutral and generally applicable. Therefore, we see no constitutional requirement that the State show the impossibility of obtaining the information it seeks from sources other than the Diocese”. íd., pág. 664.
Dos de los casos que la opinión de conformidad distingue porque no existían procedimiento interno, Archbishop of Los Angeles v. Superior Court, 131 Cal App. 4th 417 (2005), y Society of Jesus of New England v. Commonwealth, 808 N.E. 2d 272 (Mass. 2004), ocurrieron luego de que la Conferencia de Obispos de Estados Unidos adoptara la Carta en el 2002. Por otro lado, aunque Hutchinson v. Luddy y Commonwealth v. Stewart, se resolvieron antes de la adopción de la Carta, en ambos casos los peticionarios y el Tribunal entendieron que según el Canon 489 de la Iglesia Católica debían mantener un expediente secreto, separado del expediente ordinario de los sacerdotes investigados y la Diócesis estaba absolutamente prohibida de revelar su contenido. No obstante, en ambos casos los tribunales validaron los subpoenas y ordenaron la entrega de los documentos. Commonwealth v. Stewart, 690 A.2d 195, 201-202 (1997); Hutchinson v. Luddy, 414 Pa. Super. 138, 144-145 (1992), 606 A.2d 905 (1992).

 Friedrich Dürrenmat.